**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **TYLEN TRACE BAPTISTE,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**FRANK BISIGNANO,**<br>**Commissioner of the Social Security Administration,**<br><br>**Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Case No. CIV-25-225-GLJ** |

**OPINION AND ORDER**

Claimant Tylen Trace Baptiste requests judicial review of a denial of benefits by the Commissioner of the Social Security Administration pursuant to 42 U.S.C. § 405(g). He appeals the Commissioner's decision and asserts that the Administrative Law Judge ("ALJ") erred in determining he was not disabled. For the reasons discussed below, the Commissioner's decision is hereby REVERSED and the case REMANDED to the ALJ for further proceedings.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the

national economy[.]" *Id*. § 423 (d)(2)(A). Social security regulations implement a five-step sequential process to evaluate a disability claim. *See* 20 C.F.R. §§ 404.1520, 416.920.[1]

Section 405(g) limits the scope of judicial review of the Commissioner's decision to two inquiries: whether the decision was supported by substantial evidence and whether correct legal standards were applied. *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). The Court may not reweigh the evidence or substitute its discretion for the Commissioner's. *See Casias v. Secretary of Health & Human Services*, 933 F.2d 799, 800 (10th Cir. 1991). But the Court must review the record as a whole, and "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight."

[1] Step one requires Claimant to establish that he is not engaged in substantial gainful activity. Step two requires Claimant to establish that he has a medically severe impairment (or combination of impairments) that significantly limits his ability to do basic work activities. If the claimant *is* engaged in substantial gainful activity, or his impairment *is not* medically severe, disability benefits are denied. If he *does* have a medically severe impairment, it is measured at step three against the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1. If Claimant has a listed (or "medically equivalent") impairment, he is regarded as disabled and awarded benefits without further inquiry. Otherwise, the evaluation proceeds to step four, where Claimant must show that he lacks the residual functional capacity ("RFC") to return to his past relevant work. At step five, the burden shifts to the Commissioner to show there is significant work in the national economy that Claimant *can* perform, given his age, education, work experience, and RFC. Disability benefits are denied if Claimant can return to any of his past relevant work or if his RFC does not preclude alternative work. *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *see also Casias*, 933 F.2d at 800-801.

**Claimant's Background**

Claimant was twenty-three years old at the time of the administrative hearing. (Tr. 53, 265).[2] He completed twelfth grade while on a special education track. His individualized education plan ("IEP") while he was in high school included accommodations for text to speech built into online testing and stated that he required modification/accommodation and small group instruction in a special education classroom in order to gain adequate progress, noting below average scores for letter-word identification, understanding directions, and calculation, and designating only 27.54% of the instructional day in a general education setting. (Tr. 408-417). Claimant has no past relevant work. (Tr. 28). Claimant alleges that he has been unable to work since September 10, 2020, due to severe anger, learning disability, emotional problems, asthma but not that bad anymore, rashes when he gets hyper and anxious, ADD, ADHD, IEP's through entire schooling, comprehension problems, reading problems, and can't keep his hands off things. (Tr. 297).

**Procedural History**

On December 22, 2022, Claimant applied for supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-85. His application was

[2] Claimant's administrative hearing was originally set telephonically for July 5, 2022, when Claimant was 21 years old. At that time, Claimant requested an in-person hearing, which was not held until August 30, 2024.

denied. ALJ Robert Freedman conducted an administrative hearing and determined that Claimant was not disabled in a written opinion dated September 9, 2024. (Tr. 18-29). The Appeals Council denied review, so the ALJ's opinion is the final decision of the Commissioner for purposes of this appeal. *See* 20 C.F.R. § 416.1481.

**Decision of the Administrative Law Judge**

The ALJ made his decision at step five of the sequential evaluation. At step two, he found Claimant had the severe impairments of attention-deficit hyperactivity disorder ("ADHD"), learning disorder, intermittent explosive disorder, mild intellectual disability, and adjustment/mood disorder. (Tr. 20). He then determined Claimant did not meet a Listing at step three, including Listing 1.18. At step four, he found that Claimant had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with the nonexertional limitations of being limited to performing simple tasks and having interactions with co-workers, general public, and supervisors not more than frequently. (Tr. 24). The ALJ then concluded that although Claimant had no past relevant work to return to, he was nevertheless not disabled because there was work he could perform in the national economy, *e.g.*, landscape laborer, kitchen helper, and housekeeper cleaner. (Tr. 28).

**Review**

Claimant's sole argument on appeal is that the ALJ failed to properly account for the opinion of consultative examiner Amy Hudson, Ph.D. The Court agrees with Claimant's contention and the subsequent potential effect on his RFC and available work, and the decision of the Commissioner must therefore be reversed.

As noted above, the relevant evidence reflects that Claimant's education included an IEP from the time he was three years old until he graduated high school. Claimant's mother appears to have completed all of his SSI application paperwork and assisted with his SSI interview. (Tr. 294, 316). On July 6, 2021, Claimant signed a Consent for Release of Information authorizing the release of information to his mother on the basis that he was "not able to read or understand." (Tr. 267).

At age eight, Claimant underwent a "Comprehensive Bio/Psych/Social Assessment." (Tr. 520-529). At the time, he was in second grade, special education, with diagnoses of bipolar disorder and a learning disability. (Tr. 522). At the time, Claimant's mother reported Claimant's strength included, *inter alia*, that he was athletic, liked PE, was physically strong, and a hard worker. (Tr. 524). Additionally, she wrote that he had good memories, liked gardening, and was "mechanical." (Tr. 524). The Clinical Interpretation notes, in part, "Ct is likeable, clean, and mannerly. Ct becomes easily frustrated with work but finds gardening and mechanical endeavors easy." (Tr. 525). At that time, Claimant was diagnosed with attentional deficit disorder with hyperactivity by history, as well as mild mental retardation. (Tr. 534). On the WISC-III, he had a full scale IQ of 62, with a verbal IQ score of 66, and a performance IQ score of 63, and these results appeared to be an accurate measure of his true abilities. (Tr. 533).

When Claimant was fourteen years old, his IEP noted that he was eligible for special education because he was "Intellectually Disabled." (Tr. 402). As noted above, Claimant's high school IEP included accommodations for text to speech built into online testing and stated that he required modification/accommodation and small group

instruction in a special education classroom in order to gain adequate progress, noting below average scores for letter-word identification, understanding directions, and calculation, and designating only 27.54% of the instructional day in a general education setting. (Tr. 408-417). While he was "very athletic and social" and had "a lot of friends" at school, Claimant had "a significant reading disability and his short term memory is also significantly effected due to attention problems." (Tr. 407).

In January 2021, Claimant was referred for psychology, and his mother answered the phone consult and provided context. (Tr. 467). Claimant "was respectful, but minimally responsive, with most answers being 'I don't know.'" (Tr. 476). Claimant was agreeable to the consult, but reported not understanding the therapist's questions. (Tr. 468). As a result, a psychology consult was placed to reassess for intellectual disability due to Claimant's reported childhood assessment. (Tr. 479).

On April 27, 2021, Dr. Hudson reviewed Claimant's records and conducted a mental status examination and WAIS-IV testing of Claimant. (Tr. 483-487). She reported Claimant made an "excellent effort on testing," and that the results therefore reflected Claimant's "actual level of functioning." (Tr. 483). Under "Collateral Information," Dr. Hudson cited the 2009 assessment from when Claimant was eight years old, noting "He was easily frustrated with work but found gardening and mechanical endeavors easy." (Tr. 484). Claimant's mother attended the exam with him, and she was described as "very articulate and informative, though not at all intrusive," as Claimant was cooperative and attempted to answer questions. (Tr. 484). Claimant himself reported he "can't read good and stuff," and his mother likewise stated that he could not read, had trouble following

directions, needs constant supervision/redirection/modeling to do tasks, and has trouble comprehending tasks. (Tr. 484).

Dr. Hudson administered the WAIS-IV, which resulted in a full scaled IQ score of 64, with scores of: 63 for verbal comprehension, 75 for perceptual reasoning, 63 for working memory, and 76 for processing speed. (Tr. 486). Dr. Hudson reported he made excellent effort and the results reflect his level of functioning. She also noted his fund of information was very low, providing the examples that he thought there were 59 seconds in a minute and was not able to identify Martin Luther King, Jr., and either incorrectly defined or couldn't define three words. (Tr. 486). Claimant's perceptual reasoning and processing speed were both strong, but within the borderline ranges, while working memory and verbal comprehension were very poor. Dr. Hudson's prognosis noted that Claimant falls within the low end of the mild intellectual disability range, further impaired by attention deficit process and mood dysregulation. She concluded that he would not be capable of understanding and remembering even simple work instructions and performing routine repetitive tasks, that he was markedly limited in his capacity for maintaining persistence and pace for a four-hour period in order to complete a regular workday, interacting with coworkers and supervisors adequately, and adapting to workplace stressors. She noted his condition was lifelong and would not improve, and that she did not believe he was capable of managing his own finances. (Tr. 487).

State reviewing physicians determined initially and on reconsideration that Claimant could understand, recall, and perform simple, repetitive tasks, focus for two-hour periods with routine breaks, and pace and persist for an eight-hour workday and forty-hour

workweek despite psychological symptoms. Additionally, he could relate to supervisors, peers, and the general public on a superficial work basis, and adapt to a work situation. (Tr. 92, 110). These physicians had access to Claimant's test results from when he was eight years old, as well as Dr. Hudson's 2021 evaluation.

Claimant testified at the administrative hearing. In the introductory portion of the hearing, the ALJ gave Claimant an overview of how the hearing would proceed, and Claimant twice responded that he did not understand. The third and fourth times he was asked if he understood, Claimant replied "Yes, sir." (Tr. 56-57). Claimant further testified that he has trouble reading, but that he can perform household chores. Additionally, he testified that he has a driver's license and can drive, but that he does not have his own vehicle and does not really drive other than to medical appointments. (Tr. 59). He had driven once to a medical appointment in the past year. (Tr. 63). When asked about social media, Claimant reported that he has accounts with Instagram and Facebook, but that he "can't read it, so I don't do nothing. I get on there and look at pictures. No, I don't – you don't see me comment or nothing because I don't – no. I don't know how to do all of that." (Tr. 61, 64).

In his written opinion, the ALJ summarized Claimant's hearing testimony and some of the medical evidence in the record. As relevant here, at step three he found Claimant had moderate limitations in understanding, remembering, or applying information, as well as interacting with others and concentration, persistence, and based, and only mild limitation in adapting or managing oneself. (Tr. 21-22). The ALJ noted Claimant's WAIS-IV score indicated mild intellectual disability, but minimized its impact, stating,

"[h]owever, he demonstrated adequate memory, insight, and judgment at the examination. Additionally he reported that he has found gardening and mechanical endeavors to be easy. He further reported that he could drive, perform simple food preparation, and do household chores when instructed." (Tr. 21). The ALJ found that Claimant did not meet Listing 12.05(B), because he did not manifest an extreme limitation in one or a marked limitation in two of the four areas of mental functioning. (Tr. 23-24). At step four, the ALJ acknowledged Claimant's report of being special education, but said, "Yet, he also indicated that he is able to take out the trash, mop, sweep, make simple meals, and drive to appointments." (Tr. 24). In summarizing the evidence, the ALJ largely discussed it in the context of mental health impairments rather than intellectual disability, and did not discuss the combined effect of both. The ALJ twice repeated the rebuttal that Claimant could drive and once repeated that Claimant found gardening and mechanical endeavors easy. (Tr. 25, 27). He did not find Dr. Hudson's opinion persuasive, contrasting it with the telephonic psychological consult from January 2021, which indicated normal attention/concentration and logical though process and thought content. (Tr. 27, 475). He did not discuss the same section in the same entry noting low intellectual functioning, and moderate/poor insight/judgment, nor the objective WAIS-IV scores and the effect on his RFC. (Tr. 475). The ALJ found the state reviewing physician opinions persuasive, finding their assessments were generally consistent with the evidence because Claimant reported doing "pretty good" but getting angry at time during a January 2025 appointment, and that while Claimant was not in counseling he denied any barriers to obtaining it. (Tr. 27). The ALJ ultimately concluded that the claimant was not disabled. (Tr. 34-36). All three jobs

identified require, *inter alia*, reading skills. *See* DICOT §§ 408.687-014 (landscape laborer), 318.687-010 (kitchen helper), 323.687-014 (housekeeping cleaner).

Claimant argues that the ALJ failed to properly assess his RFC because he did not properly evaluate Dr. Hudson's opinion. The Court agrees. Medical opinions are evaluated pursuant to 20 C.F.R. §§ 404.1520c and 416.920c. Under these rules, the ALJ does not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)[.]" 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the ALJ evaluates the persuasiveness of all medical opinions and prior administrative medical findings by considering a list of factors. *See* 20 C.F.R. §§ 404.1520c(b), 416.920c(b). The factors are: (i) supportability, (ii) consistency, (iii) relationship with the claimant (including length of treatment relationship, frequency of examinations, purpose and extent of treatment relationship, and examining relationship), (iv) specialization, and (v) other factors that tend to support or contradict a medical opinion or prior administrative finding including, but not limited to, "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." 20 C.F.R. §§ 404.1520c(c), 416.920c(c). Supportability and consistency are the most important factors in evaluating the persuasiveness of a medical opinion and the ALJ must explain how both factors were considered. *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). Generally, the ALJ is not required to explain how the other factors were considered. *Id.* However, when the ALJ finds that two or more medical opinions or prior administrative findings on the same issue are equally well-supported and consistent with the record but are not exactly the same, the ALJ must explain how "the

other most persuasive factors in paragraphs (c)(3) through (c)(5)" were considered. 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3).

The supportability factor examines how well a medical source supported their own opinion with "objective medical evidence" and "supporting explanations." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). The consistency factor calls for a comparison between the medical opinion and "the evidence from other medical sources and nonmedical sources" in the record. 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). Here, the ALJ found the opinion inconsistent with the evidence as a whole because of the (incomplete) assessment that he was cooperative, focused, calm, and had normal attention and concentration during a *telephonic* intake, and that he reported doing "pretty good" in January 2024. Furthermore, he repeatedly overstated Defendant's capabilities by incorrectly stating Claimant reported he found gardening and mechanical endeavors easy. This repeated statement gives the impression that it was a statement, made by Claimant, as part of his present assessment for disability benefits. In reality, it is a statement *about Claimant* when he was eight years old, *made by his mother* when asked about his strengths. (Tr. 524-525). Furthermore, in reviewing Dr. Hudson's assessment, and at step four, the ALJ failed to distinguish Claimant's mental impairments from intellectual impairments, including Claimant's inability to read that is well-documented throughout the record, and failed to assess their combined effect. *See Briggs ex rel. Briggs v. Massanari,* 248 F.3d 1235, 1239 (10th Cir. 2001) ("Although the ALJ need not discuss all of the evidence in the record, he may not ignore evidence that does not support his decision, especially when that evidence is 'significantly probative.'") [citation omitted]; *Clifton,* 79 F.3d at1010 ("[I]n

addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence that he rejects.") [citation omitted].

This error with regard to evaluation of Dr. Hudson's opinion is indicative of larger errors. "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g.*, laboratory findings) and nonmedical evidence (*e.g.*, daily activities, observations)." Soc. Sec. Rul. 96-8p, 1996 WL 374184, at *7 (July 2, 1996). "[I]t is incumbent on the ALJ to comply with SSR 96-8p by providing a narrative explanation for his RFC finding that plaintiff can perform [the] work, citing to specific medical facts and/or nonmedical evidence in support of his RFC findings." *Jagodzinski v. Colvin*, 2013 WL 4849101, at *5 (D. Kan. Sept. 11, 2013). The ALJ fails to connect the RFC to the evidence in the record and, as discussed above, fails to acknowledge multiple records indicative of additional/differing limitations. The ALJ did not explain how inability to read rendered him capable of performing jobs that require reading skills. Furthermore, he failed to consider all of the impairments in combination. This is error because the ALJ is required to consider all of a claimant's impairments – both severe and nonsevere – singly and in combination, when formulating a claimant's RFC. *See, e.g., Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("'At step two, the ALJ must 'consider the combined effect of all of [Claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity [to survive step two]. Nevertheless, any error here became harmless when the ALJ reached the proper conclusion that [Claimant] could not be denied benefits conclusively at step two

and proceeded to the next step of the evaluation sequence.") (quoting *Langley v. Barnhart*, 373 F.3d 1116, 1123-24 (10th Cir. 2004) (quoting 20 C.F.R. § 404.1523)); *see also Hill v. Astrue*, 289 Fed. Appx. 289, 292 (10th Cir. 2008) ("But this does not mean the omitted impairment simply disappears from his analysis. In determining the claimant's RFC, the ALJ is required to consider the effect of *all* of the claimant's medically determinable impairments, both those he deems 'severe' and those 'not severe.'") [emphasis in original] [citations omitted]. The Court must be able to follow the logic, and here it cannot. *See Jagodzinski*, 2013 WL 4849101, at *2 ("When the ALJ has failed to comply with SSR 96-8p because he has not linked his RFC determination with specific evidence in the record, the court cannot adequately assess whether relevant evidence supports the ALJ's RFC determination.") (citing *Brown v. Commissioner of the Social Security Administration*, 245 F. Supp. 2d 1175, 1187 (D. Kan. 2003)).

On remand, the ALJ should likewise carefully evaluate *all* the evidence related to Claimant's impairments. If such analysis on remand results in any adjustment to Claimant's RFC, the ALJ should then redetermine what work, if any, Claimant can perform and ultimately whether he is disabled.

## Conclusion

In summary, the Court finds that correct legal standards were not applied by the ALJ, and the Commissioner's decision is therefore not supported by substantial evidence. Accordingly, the decision of the Commissioner is hereby REVERSED, and the case is REMANDED for further proceedings consistent with this Opinion and Order.

**DATED** this 22nd day of September, 2026.

**GERALD L. JACKSON**
**UNITED STATES MAGISTRATE JUDGE**